# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| EDWARD GRAHAM, | : | | |
| | : | | |
| Plaintiff, | : | NO. | 3:04cv1858 (MRK) |
| | : | | |
| v. | : | | |
| | : | | |
| BOEHRINGER INGELHEIM | : | | |
| PHARMACEUTICALS, INC. & | : | | |
| DENNIS CADDEN, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OF DECISION

Plaintiff Edward Graham brings this action under the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12111-12117, alleging that he was fired after twenty-four years of employment with Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") because the company erroneously perceived that he was disabled – in particular, that he was suffering from a mental illness.  In addition to his federal claim, Mr. Graham also asserts causes of action under state anti-discrimination, defamation, and contract law. Boehringer and Mr. Graham's former supervisor Dennis Cadden have now moved for summary judgment, *see* Motion for Summary Judgment [doc. # 37].

As is described below and as the Court stated at oral argument on the summary judgment motion, this litigation is most regrettable.  For it seems to the Court that Mr. Graham's termination was not in the best interests of either party to this action.  Boehringer lost a valued and valuable employee; Mr. Graham lost a job that by all accounts he had performed well and enjoyed.  So, one must ask, why did this occur? From the record developed during discovery, it appears to the Court

1

that the fault lies with everyone involved – Boehringer, which might have conducted a more thorough investigation of the charges leveled against Mr. Graham; Mr. Graham, who could have been less stubborn and more willing to do what was needed to return to work; and two particularly headstrong psychologists, who, in the Court's view, allowed their own egos to get in the way of commonsense and good judgment, all to the detriment of those they were charged with serving – Boehringer and Mr. Graham. However, none of this imprudence, lack of perspective, and unwillingness to compromise on the part of the participants in this unfortunate series of events establishes a violation of the ADA, the only federal claim in this lawsuit. Therefore, for the reasons explained below, the Court GRANTS judgment for Defendants on Mr. Graham's ADA claim. Having disposed of the only federal claim in this case, the Court declines to exercise supplemental jurisdiction over his state law claims, which are therefore DISMISSED without prejudice to renewal in state court.

## I.

The summary judgment standard is a familiar one.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(b).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A]ctual disputes that are irrelevant or unnecessary will not be counted." *Anderson*,  477 U.S. at 248. The moving party bears the burden of demonstrating that no genuine issue exists as to

2

any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255.  Although courts must exercise caution in granting summary judgment to the defendant in employment discrimination cases where the employer's intent is in question, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997), "[s]ummary judgment is appropriate even in discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998), but "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  In brief, to survive summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997).

## II.

The following forms the factual background to Mr. Graham's claim of perceived disability discrimination.  As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Mr. Graham. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

On October 10, 2002, Mr. Graham, a long-time Boehringer employee, was transferred to a new department, the informatics group, as part of the company's reorganization efforts.  Defendants' Memorandum in Support of Motion for Summary Judgment [doc. # 37] Ex. 3 at 49, 55-56.

Following his transfer, Mr. Graham would be supervised by Frank Wang, Dennis Cadden, and John Omasta. *Id.* On the day of the transfer, Mr. Graham expressed to Messrs. Wang and Cadden misgivings about working under Mr. Omasta since Mr. Graham believed that Mr. Omasta had prevented him from receiving an earlier promotion. *Id.* Ex. 3 at 40. On the following day, October 11, Mr. Cadden reported to Mr. Omasta and Darlene Russell, the Human Resources representative assigned to the department, that he had overheard Mr. Graham make a verbal threat the day before that he would "go postal." *Id.* Ex. 1 at 17-18, 22-23. Mr. Graham asserts in his summary judgment papers that Mr. Cadden fabricated his report of the threat in retaliation for Mr. Graham previously reporting Mr. Cadden for ethical violations. *See* Plaintiff's Local Rule 56 Statement [doc. # 39] at 12-13; Plaintiff's Memorandum in Opposition to Motion for Summary Judgment [doc. # 39] at 16. Mr. Graham does not deny that on October 10 a remark about "going postal" was made, but he asserts that the remark was made to him by another employee and that it was stated in a jocular context. Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] Ex. 3 at 82. Regardless of the truth of Mr. Graham's allegations about Mr. Cadden's motivations and about what actually occurred on October 10, there is no dispute that Mr. Cadden did in fact report to the company that Mr. Graham had made a verbal threat to "go postal."

At the time of the alleged threat, Boehringer had in place a written Workplace Violence Policy (the "Policy"), which included a mandatory protocol for responding to workplace threats. Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 4. The Policy required that an investigation take place and warned that a workplace threat could lead to termination. *Id.* The Policy also stated that employees who commit threats of violence or who pose a threat of violence

may be required to participate in a "fitness for duty evaluation." *Id.*[1]  In light of the Policy and Mr.

Cadden's report, Mr. Omasta and Ms. Russell met with Mr. Graham on October 14 and placed him

on administrative leave with full pay and benefits.  Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc.

# 39]  Ex. 3 at 82-83.  At the time, Ms. Russell promised Mr. Graham that she would thoroughly

investigate the charges.  *See* Graham Deposition at 79.  Ms. Russell also instructed Mr. Graham to

contact Boehringer's Employee Assistance Program ("EAP"), a third-party provider, to receive a

referral to a therapist outside of the company for a professional assessment.  *See* Defs.' Mem. in

Supp. of Mot. for Summ. J. [doc. #  37] Ex. 8.  Mr. Graham did so and elected to see the closest

available therapist, Stephen Knezek.  *See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] Ex.

3 at 85.  Mr. Graham proceeded to attend three sessions with Mr. Knezek over the following two

weeks.  *Id*.  Boehringer intended Mr. Knezek to conduct a fitness for duty evaluation of Mr. Graham

to determine if he could return to work, but discovered, after Mr. Graham had completed the three

sessions, that a fitness for duty evaluation was outside the scope of the EAP's duties. *See* Defs.'

Mem. in Supp. of Mot. for Summ. J. [doc. #  37] Ex. 11.

     In order to obtain a fitness for duty evaluation, Boehringer then required Mr. Graham to see

Dr. Joseph Zacker, a psychologist who had previously consulted for Boehringer.  Graham Dep. at

91-92.  After meeting with Mr. Graham and administering multiple psychological assessment tests,

Dr. Zacker reported to Boehringer in his Fitness for Duty Evaluation, Defs.' Mem. in Supp. of Mot.

for Summ. J. [doc. #  37] Ex. 13, that Mr. Graham demonstrated poor anger management skills and

manifested some preoccupation with death and a willingness to consider seeking revenge.   There

---

[1] Mr. Graham does not recall whether he received a copy of or reviewed the Policy.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 5; . Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] Ex. 3 at 21-22.

is also no dispute that Dr. Zacker reported to Boehringer that he could not rule out the possibility of violence and advised the company that it was inappropriate for Mr. Graham to return to work at that time. *Id*. Dr. Zacker further recommended that Mr. Graham consult with a specialist in anger management. *Id.*

After speaking with Ms. Russell, Mr. Graham elected to see Dr. Martin Rosmarin, another psychologist who specialized in anger management and whom Dr. Zacker approved. *See* Graham Dep. at 109; Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 12 at 2-3. On December 11, 2002, Ms. Russell sent Mr. Graham a letter stating that Mr. Graham must meet with a therapist for a minimum of four sessions[2] and confirming Mr. Graham's choice to work with Dr. Rosmarin. Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 14. In addition, Ms. Russell informed Mr. Graham that he was being placed on short-term disability, *id*, which allowed Mr. Graham to continue to receive his full salary. *See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] Ex. 3 at 83. During this period, Ms. Russell had agreed to conduct a thorough investigation of the allegations against Mr. Graham. *Id*. Ex. 7 at 99. From the limited record before the Court, a reasonable jury could conclude that her investigation of Mr. Cadden's charges was rather cursory and that Ms. Russell elected to convey only one side of the story (the side unfavorable to Mr. Graham) to Dr. Zacker. *See id*. at 32-33, 82-100.

After meeting with Mr. Graham for three sessions, Dr. Rosmarin sent a letter on December 23 to Boehringer stating that he found "no significant evidence to suggest that Mr. Graham presents

---

[2] In a letter to Mr. Graham, Ms. Russell stated that Dr. Zacker required Mr. Graham to attend at least four sessions with a therapist, *see* Defs.' Mem. In Supp. of Mot. for Summ. J. [doc. # 37] Ex. 18, but Dr. Zacker does not refer to a specific number of required sessions in his evaluation. *See id*. Ex. 13 at 5.

any harm of threat to others." *Id.* Ex. 26.  Mr. Graham claims that he asked Dr. Rosmarin to see him

for a fourth session in order to complete Dr. Zacker's protocol but that Dr. Rosmarin would not

allow a fourth session.  *See* Graham Dep. at 141-42.  Regardless, there is no dispute that Dr. Zacker

was unsatisfied with Dr. Rosmarin's report and with the fact that Dr. Rosmarin had met only three

times with Mr. Graham.  Dr. Zacker therefore informed Boehringer that Mr. Graham needed to

comply with the protocol detailed in his report before Dr. Zacker would give his approval for Mr.

Graham to return to work.  Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. #  37] Ex. 12 at 4.

Complicating the situation was Dr. Rosmarin's apparent refusal to discuss his assessment of Mr.

Graham with Dr. Zacker or to provide any further detail to Boehringer outside of the letter he sent

on December 23.  *See id.* Ex. 17.  Mr Graham recalled a conversation in late December with Virginia

Leo, a nurse in Boehringer's Occupational Health Services (OHS) Department, when he attempted

to facilitate contact between the two psychologists and she told him there was nothing else he could

do.  *See* Graham Dep. at 130.

On January 8, 2003, Ms. Russell sent a letter to Mr. Graham stating that, in accordance with

the requirements of the company's Workplace Violence policy, Dr. Zacker had designed a protocol,

with which Mr. Graham must comply to Dr. Zacker's satisfaction, before Mr. Graham could return

to work.  The letter recited some of the disagreement between Dr. Rosmarin and Dr. Zacker and

stated that "your physician's continued failure to cooperate with the protocol established by Dr.

Zacker and/or to satisfy the reasonable requests of OHS for medical information supporting your

leave of absence is your responsibility and will result in disciplinary action, up to and including

termination of your employment."  Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. #  37] Ex. 18.

The letter concluded as follows: "Thank you for your attention and anticipated cooperation.  It would

be most unfortunate if your employment were to be terminated due to a lack of cooperation with our policies." *Id.*

Over the course of January and February 2003, Mr. Graham and his attorney exchanged letters with Boehringer discussing the conditions set by Dr. Zacker that were preventing Mr. Graham from returning to work. Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Exs. 18-27. Boehringer instructed Mr. Graham to arrange for Dr. Rosmarin to talk with Dr. Zacker or to select a new therapist and attend four more sessions with the new therapist in order to satisfy Dr. Zacker's protocol. *See id.* Ex. 20. On February 5, 2003, Mr. Graham's attorney sent Boehringer a letter containing a copy of therapy notes made by Mr. Knezek, whom Mr. Graham had seen pursuant to the EAP referral. *See id.* Ex. 25. Prior to this time, Boehringer had neither seen nor had access to Mr. Knezek's records. *See id*. Ex. 11. Boehringer forwarded Mr. Knezek's notes to Dr. Zacker who remained dissatisfied, since he found no evidence that Mr. Knezek had evaluated Mr. Graham's anger management skills. *See id*. Ex. 12. In a letter to Mr. Graham's attorney dated February 20, Boehringer reported that Dr. Zacker was not satisfied by Mr. Knezek's notes and still required Mr. Graham to seek out a new therapist of his choice to fulfill Dr. Zacker's conditions. *See id.* Ex. 26. Boehringer informed Mr. Graham that if he did not comply, he would be laid off administratively. *Id.*

Frustrated by what he perceived to be unreasonable conditions, Mr. Graham elected not to seek out another therapist. Graham Dep. at 143-44. Following this decision, Boeheringer sent a letter to Mr. Graham on March 4, informing him that he had been administratively laid off as of March 3. *See* Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 28. The letter stated, "[k]eep in mind, that given your skill set and our needs for this position, we would greatly have

preferred to have been able to bring you back to work following your compliance with policy. However, given your refusals, we cannot treat you differently than others under our policy and your actions have served to tie our hands and to require your separation from employment." *Id.*   The letter urged Mr. Graham to reconsider, comply with the conditions set by Dr. Zacker, and to "seek re-employment with the Company." *Id.*

On April 8, Boehringer sent Mr. Graham a letter informing him that he may qualify for long-term disability benefits since he was terminated while on short-term disability. *See id.* Ex. 30. Boehringer says that after short-term disability benefits end, the company automatically sends an application for long-term disability and makes no determination as to whether or not the employee is actually disabled. *See id.* Ex 31.  The letter included instructions on how to apply to the third-party provider of disability benefits but disclaimed any guarantee of receiving long-term disability benefits. *Id.* Boehringer included with the letter several forms that Mr. Graham needed to complete in order to apply to the third-party provider for disability benefits.  One form required certain information from the employer that Boehringer had already completed. *See id.* Ex. 32.  This form included only factual information about Mr. Graham's employment and insurance coverage and did require the employer to offer any information about the relevant disability. *Id.*

Mr. Graham originally filed suit against Boehringer and Mr. Cadden in state court on April 8, 2004. *See* Ruling on Motion to Remand [doc. # 12].  At that time, Mr. Graham only filed claims under state law.  Mr. Graham later amended his complaint to include an ADA claim on October 22, 2004, and Boehringer timely removed the action to this Court. *See* Notice of Removal [doc. # 1].[3]

---

[3]  Mr. Graham moved to remand the case to state court on the ground that the removal was untimely, *see* Motion to Remand [doc. # 7], an argument that the Court rejected.   *See* Ruling on Motion to Remand [doc. # 12].

In addition to Mr. Graham's ADA claim, his state causes of action include claims that Boehringer violated the Connecticut Fair Employment Practices Act and breached its contract with him.  Mr. Graham also brought a defamation claim against Mr. Cadden, who is not a defendant in the other claims, for falsely reporting to Boehringer that Mr. Graham had made a threat.

### III.

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). Employment discrimination claims under the ADA are subject to the familiar *McDonnell Douglas* burden-shifting analysis: A plaintiff must establish a *prima facie* case; the employer must come forward with a legitimate non-discriminatory reason for the termination; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext and that the real reason for the termination was an unlawful one. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted; alteration in original). "The ultimate question is whether the employer intentionally discriminated, and . . . [i]t is not enough . . . to *dis*believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 147.  While the parties dispute some facts related to the motivation of certain Boehringer employees, the Court finds that summary judgment is appropriate on Mr. Graham's ADA claim because "upon review of the record as a whole, [] there [are] no genuine issues of material fact in the instant case – that is, that even after drawing all inferences in

10

the light most favorable to [Mr. Graham], no reasonable jury could [] issue[] a verdict in his favor"

on his ADA claim.  *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005).

A.      *Prima Facie* Case of Discrimination

To establish a *prima facie* case of disability discrimination, a plaintiff typically must prove

that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the

ADA; (3) the plaintiff was otherwise able to perform the essential functions of his job, with or

without accommodation; and (4) the plaintiff suffered an adverse employment action because of the

disability.  *See, e.g.*, *Giordano*, 274 F.3d at 747.  However, the ADA also recognizes a cause of

action for plaintiffs who are not in fact disabled, but claim that they were erroneously "regarded as

having such an impairment," and discriminated against on that basis. 42 U.S.C. §  12102(2)(C).

That is what Mr. Graham has alleged in this case, and therefore, his burden on the second prong of

his *prima facie* case is to show that Boehringer "regarded [him] as disabled *within the meaning of*

*the ADA*." *Giordano*, 274 F.3d at 748 (emphasis in original).

The reason for the emphasis on the words "*within the meaning of the ADA*" in the preceding

sentence is that it is not enough for an employee to show that the employer regarded him as disabled.

Instead, the employer must regard the employee as disabled within the meaning of the ADA,

meaning that the employer must have "regarded the [employee] as having an impairment that

*substantially limits a major life activity*." *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646

(2d Cir. 1998) (emphasis added).  Moreover, under the ADA, for an impairment to substantially limit

a major life activity, its impact must "be permanent or long term." *Toyota Motor Mfg., Kentucky,*

*Inc. v. Williams*, 534 U.S. 184, 198 (2002). "[T]emporary, non-chronic impairments of short

duration, with little or no long term or permanent impact, are usually not disabilities."  29 C.F.R.

11

app. § 1630.2(j).  The Supreme Court has also instructed that "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999).  In this case, the major life activity at issue is that of working.  *See* Pl's Opp'n to Mot. for Summ. J. [doc. # 39] at 9.  In sum, to satisfy the "regarded as disabled" prong of his *prima facie* case, Mr. Graham must show that Boehringer "perceived [him] to be incapable of working in a broad range of jobs suitable for persons of [his] age, experience, and training," *Colwell*, 158 F.3d at 647 (internal quotation marks omitted), as a result of a chronic mental impairment that was not correctable by medication or other measures.

The Court recognizes full well that a plaintiff's burden in establishing a *prima facie* case of discrimination is *de minimis*. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998).  Nonetheless, the Court has serious reservations about the sufficiency of Mr. Graham's proof that Boehringer perceived him as disabled within the meaning of the ADA.  Taking the evidence in the light most favorable to Mr. Graham, the Court does not believe that he has produced any evidence that Boehringer perceived him to be permanently incapable of work as a result of a chronic mental impairment that was not correctable by medication or other measures.  To the contrary, the letter Boehringer sent Mr. Graham notifying him of his termination expressly stated that the company wanted Mr. Graham to return to his former position following completion of the therapy sessions that Dr. Zacker required.  *See, e.g.*, Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Exs. 14, 18, 28.  Indeed, Boehringer, even after laying off Mr. Graham, encouraged him to re-apply for the same position if he changed his mind and completed the treatment regimen prescribed by Dr. Zacker. *See id.* Ex. 28.  If true, Boehringer would not have perceived Mr. Graham to be disabled as defined

by the ADA.  *Cf. Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 471 n.5 (4th Cir. 2002) (finding an employee was not disabled under the ADA due to a nine month recovery from an operation in part because the "work limitations were temporary and [the employee] would eventually, if not soon, return to her former duties").  In *Ryan v. Grae & Rybicki, P.C.*, for example, the Second Circuit held that a plaintiff did not meet her *prima facie* burden in a "perceived as disabled" ADA case in part because the employer offered to give the employee a good recommendation, suggesting that the employer "did not perceive her as being unable to perform related jobs."  135 F.3d 867, 873 (1998).

For these reasons, the Court has serious doubts that Mr. Graham has met the requirements of a *prima facie* case of disability discrimination.  However, recognizing the "minimal requirements" of a *prima facie* case, *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993), the Court prefers not to resolve this case on the basis of the *prima facie* case and will instead move on to the second and third prongs of the *McDonnell Douglas* test.

B.      Legitimate, Non-Discriminatory Rationale of Employer

Assuming *arguendo* that Mr. Graham has established a *prima facie* discrimination case for a "regarded as" disability, the burden shifts to Boehringer to articulate a legitimate non-discriminatory reason for terminating Mr. Graham's employment.  *Sista*, 445 F.3d at 169**.**  This burden is one of production, not persuasion; it "can involve no credibility assessment."  *St. Mary's Honor Center*, 509 U.S. at 509.  According to Boehringer, the company was obliged to discharge Mr. Graham because it believed that he had made a threat of violence against a supervisor and then failed to complete the steps necessary to allow a consulting psychiatrist to certify that Mr. Graham did not pose a danger to his fellow employees.  Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 26.

13

Given the report Boehringer received of Mr.Graham's alleged threat – a report that Mr. Graham does not deny was made – Boehringer reasonably decided to refer Mr. Graham for a fitness for duty evaluation pursuant to its established Workplace Violence Policy.   Furthermore, Mr. Graham does not dispute that Dr. Zacker refused to clear Mr. Graham to return to work and that the psychologist also warned the company of Mr. Graham's potential for violence. Any reasonable company would be concerned about its own exposure to liability (let alone the safety of its employees) should it choose to overrule an independent mental health expert whom the company asked to perform a fitness for duty evaluation of a company employee.  *See Merheb v. State Toll Highway Auth.*, 267 F.3d 710, 713-14 (7th Cir. 2001) (noting that the prevalence of workplace violence justifies "management in treating threatening behavior with exemplary severity"); *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997) ("The [ADA] does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge–in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone.").  Boehringer's requirement that Dr. Zacker clear Mr. Graham before he could return to work, the company's deference to the judgment of the mental health professional, and Mr. Graham's acknowledged failure to comply with Dr. Zacker's protocol constitute legitimate, non-discriminatory reasons for terminating Mr. Graham and thus satisfy the company's burden under the *McDonnell-Douglas* framework.

C. Proffered Reason for Termination is Pretextual and the Real Reason Was Unlawful

Once the company offers a legitimate, non-discriminatory reason for its action, a plaintiff must then produce evidence and ultimately carry the burden of persuasion that the proffered reason is a pretext for unlawful discrimination.  *Sista*, 445 F.3d at 169.  Such a pretext "may be

14

demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case . . . ." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (quotations omitted). Establishing that the stated rationale is pretextual, however, is not alone sufficient to carry a plaintiff's burden.  The plaintiff must also demonstrate that the real reason for the company's action was unlawful, *see, McPherson v. N.Y. City Dept. of Educ.*, No. 05-4387-CV, 2006 WL 1967033 at *3 (2d Cir. July 13, 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer . . . .'"), though in some cases, evidence of pretext can also be used to establish discriminatory motive. *See Reeves v. Sanderson Plumbing Prod., Inc.* 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Mr. Graham alternates between two theories regarding Boehringer's motivations for his termination.  On the one hand, he argues that the company knew all along that Mr. Cadden's allegations of a threat were false and that the company seized upon the false threat as a way to fire Mr. Graham by putting him through an endless series of requirements that the company never intended to allow him to fulfill.  At other points, however,  Mr. Graham argues that Boehringer did in fact perceive him to be disabled and fired him not, as the company claims, because of his failure to comply with Dr. Zacker's protocol, but rather because the company regarded him as disabled and wanted to get rid of him for that reason.

At the outset, the Court can dispose of Mr. Graham's first theory, to which he dedicated a

substantial portion of his brief and oral argument.  According to Mr. Graham, Mr. Cadden lied when reporting the alleged threat and the company knew that Mr. Cadden was lying.  Thus, in his brief, Mr. Graham asserts there was "overwhelming evidence that the defendant Cadden was lying about the plaintiff and that the employer . . . intentionally and knowingly covered up the truth . . . ."  Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] at 13.  But if Mr. Graham's theory is correct, his ADA claim is necessarily doomed.  For  if, as he claims, Mr. Cadden lied about Mr. Graham's threat and Boehringer employees were complicit in Mr. Cadden's false allegations or attempted to cover Mr. Cadden's lie, then the company could not possibly have regarded Mr. Graham as disabled within the meaning of the ADA, as is required for his ADA claim.  Indeed, on this view of the case, the company knew that Mr. Graham had not threatened anyone, knew that he was not subject to the Workplace Violence Policy, knew he did not need to see any physicians for any reason, and also knew that he did not pose a threat to any employees.  In sum, the company knew he was *not* disabled.  While such assertions, if proved, might provide a basis for his state law claims, they decidedly do not provide proof of a "regarded as" disabled claim under the ADA.

Mr. Graham's alternative theory of the case fits (as a matter of logic) within the context of a "regarded as" disabled ADA claim.  However, this  theory ultimately falters because Mr. Graham has not provided evidence that would permit a reasonable jury to conclude that Boehringer's asserted justifications for his termination were pretextual and that the real reason for the company's action was that it regarded him as disabled within the meaning of the ADA.

Turning first to the issue of pretext, Mr. Graham claims that, at some point after Mr. Cadden made his allegations against Mr. Graham, Boehringer employees decided that Mr. Graham was disabled and would have dismissed him for this disability, regardless of whether he complied with

Dr. Zacker's protocol or whether Dr. Zacker cleared him to return to work.  However, there is absolutely no evidence (beyond Mr. Graham's rank speculation) to suggest that Boehringer would not have permitted Mr. Graham to return to work had he completed the counseling sessions required by Dr. Zacker.  *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) ("[T]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.") (quotations omitted).  It is undisputed that Boehringer repeatedly told Mr. Graham in writing that if he complied with Dr. Zacker's requirements and was cleared to return to work, he would be allowed do so.  *See id.* Exs. 14, 18, 28.  It is undisputed that Mr. Graham never complied with Dr. Zacker's requirements and that Dr. Zacker never cleared Mr. Graham to return to work.  Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 12. There is no evidence that Dr. Zacker and Boehringer were involved in some joint effort or conspiracy to ensure that Mr. Graham could never return to work.[4]  Rather, all evidence suggests that Mr. Graham was terminated for precisely the reasons stated by Boehringer–namely, that he failed to complete the treatment protocol demanded by an independent physician and as a result, he was not cleared to return to work.  Regardless of whether Dr. Zacker's demands were reasonable or not, there is no evidence to suggest that Boehringer's reliance on Dr. Zacker to clear Mr. Graham for return to work was pretextual in any way.

Beyond failing to establish pretext, Mr. Graham has also failed to proffer evidence that would

---

[4] Mr. Graham alleges that Boehringer employees withheld information from Dr. Zacker that Mr. Graham did not make the threatening statements and that this withholding of information influenced Dr. Zacker's views of Mr. Graham.  *See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] at 7.  As noted above, however, those allegations, if credited,  are logically inconsistent with his ADA claim.  To the extent that Boehringer employees did not believe Mr. Graham made the statements, they could not have perceived Mr. Graham to be disabled.

permit a reasonable jury to conclude that the real reason for his dismissal was because he was regarded as disabled within the meaning of the ADA.  To establish that Boehringer perceived him to be disabled within the meaning of the ADA, Mr. Graham alleges that Boehringer terminated him because of a "yet-undiagnosed psychiatric condition which made him an immediate risk to the lives of others."  Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] at 9. In support of this claim, Mr. Graham relies on the following facts: (1) Boehringer insisted that Mr. Graham submit to psychological evaluations; (2)  Boehringer placed him on short-term disability; and (3) Boehringer suggested that he file for long-term disability.  *See id.* at 10-11.

Boehringer's efforts in accordance with its Workplace Violence Policy to have Mr. Graham tested by an independent mental health expert to determine his fitness for duty and its requirement that Mr. Graham comply with the recommendations of the examining psychologist would not permit a jury to conclude that Boehringer regarded Mr. Graham as disabled within the meaning of the ADA.  Courts have repeatedly held that requiring mental and physical examinations to determine fitness for duty are not enough to suggest that an employee is regarded as mentally disabled.  For example, in *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635 (2d Cir. 1998), the Second Circuit held that the requirement that employees submit to physical exams to determine their fitness for duty suggested "no more than that their physical condition was an open question."  *Id.* at 647; *see also Sullivan v. River Valley School District*, 197 F.3d 804, 810 (6th Cir. 1999) (requiring examinations to determine fitness for duty is insufficient to suggest employee is regarded as mentally disabled); *Cody v. Cigna Healthcare of St. Louis*, 139 F.3d 595, 599 (8th Cir. 1998) (a request for evaluation is not equivalent to treatment as disabled).  At most, such evidence suggests that the company regarded Mr. Graham's mental condition as an open question that required assessment by a

18

professional.

Similarly, merely requiring Mr. Graham to follow Dr. Zacker's advice to seek anger management counseling before returning to work also fails to demonstrate that Boehringer considered Mr. Graham to be disabled under the ADA. *See Ruhlmann v. Ulster County Dept. of Soc. Servs.,* 234 F. Supp.2d 140, 177 & n.18 (N.D.N.Y. 2002) (granting medical leave of absence for mental health concerns does not suggest an employer considered an employee to be disabled under the ADA) (citing *Kramer v. Hickery-Freeman, Inc.*, 142 F. Supp.2d 555, 560 (S.D.N.Y. 2001)); *Johnson v. Boardman Petroleum*, 923 F. Supp. 1563, 1568 (S.D. Ga. 1996) (suggesting that an employee take time off and seek professional counseling did not demonstrate that the employer considered the employee to be disabled under the ADA.  As more than one court has noted, to accept Mr. Graham's contention that, in requiring a mental examination and brief counseling regimen, Boehringer demonstrated that it considered Mr. Graham to be disabled would "discourage[] employers from taking such preliminary or temporary steps to keep their employees happy for fear that showing concern for an employee's alleged medical problems could draw them into court facing an ADA claim based on a perceived disability." *Kramer*, 142 F. Supp.2d at 560 (quotations omitted).

Similarly, placing Mr. Graham on short-term disability did not demonstrate that Boehringer considered Mr. Graham to be disabled. *See Ward v. U.S. Surgical Div. of Tyco Healthcare Group*, No. 3:03CV1326 (WWE), 2005 WL 2972974 at *12 (D. Conn. Sept. 16, 2005) (recommending that an employee apply for short-term disability benefits does not demonstrate that the employer believed the employee was disabled under the ADA); *Chubirka v. Int'l Paper/xpedx Paper & Graphics*, No. Civ.A.04-5010, 2005 WL 1840170 at *4 (E.D. Pa. Aug. 2, 2005) (granting summary judgment in

favor of employer for ADA claims even though employee was provided short-term disability benefits); *Summers v. Middleton & Reutlinger, P.S.C.*, 214 F. Supp. 2d 751, 756 (W.D. Ky. 2002) (placing employee on short-term disability "does not establish [that the employer] regarded [the employee] as disabled.").  As discussed above,  "[t]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities" within the meaning of the ADA.  29 C.F.R. app. § 1630.2(j).

Finally, no reasonable jury could conclude that Boehringer's forwarding long-term disability benefit forms demonstrated that Boehringer regarded Mr. Graham as disabled under the ADA. Boehringer stated that it routinely sent information about long-term disability benefits to any employee who had been on short-term disability for three months.  Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 37] Ex. 31.  Mr. Graham has not submitted any evidence to rebut Boehringer's assertion.  Moreover, both parties agree that the long-term disability benefits were provided by a third party and that Boehringer had no authority to determine who qualified for long-term disability benefits.  Defs.' Local Rule 56(a)(1) Statement of Undisputed Facts [doc. # 37] para. 78-80.  Given the undisputed facts about the non-discretionary manner in which Boehringer distributes long-term disability information to employees, the receipt of such information by Mr. Graham does not create a genuine issue of material fact that would permit a jury to conclude that Boehringer regarded Mr. Graham was disabled as defined by the ADA.  S*ee Greene v. UPS*, 125 F. Supp. 2d 517, 523-24 (M.D. Ga. 2000) (granting summary judgment to employer after determining that sending long-term disability benefit information to employee did not demonstrate that employer believed employee was disabled under the ADA).

Mr. Graham relies heavily upon *Howell v. New Haven Bd. of Educ.*, 309 F. Supp. 2d 286 (D.

Conn. 2004), in support of his claim that sufficient material facts exist to defeat a motion for summary judgment. The facts in *Howell*, however, are easily distinguishable from those presented here. In *Howell*, the court found sufficient evidence to support the claim that a high school principal, *knowing of a school teacher's disability*, made a false accusation against the teacher, which resulted in the teacher's termination. Mr. Graham, on the other hand, has produced no evidence that Mr. Cadden's allegedly false accusation was motivated by Mr. Cadden's belief that Mr. Graham was disabled. To the contrary, Mr. Graham asserts that the motivation for Mr. Cadden's allegations was that Mr. Graham had previously accused Mr. Cadden of ethical violations. Pl.'s Mem. in Opp'n to Mot. for Summ. J. [doc. # 39] at 16. Moreover, unlike in *Howell*, Mr. Graham alleges that Boehringer began to regard him as disabled only after Mr. Cadden's false accusation.

Given the lack of evidence that Boehringer perceived Mr. Graham to be disabled as defined by the ADA, the refusal of Dr. Zacker to clear Mr. Graham to return to work, and the logical inconsistencies in Mr. Graham's theories of liability, the Court finds that Boehringer is entitled to summary judgment on his ADA claim. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (granting motion for summary judgment in ADA case after finding insufficient evidence to override employer 's proffered justification).

## IV.

In light of the Court's dismissal of the only federal cause of action pled in the complaint, the Court, exercising its discretion under 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the remaining state causes of action. While it is true that the Court may exercise supplemental jurisdiction over Mr. Graham's state law claims under 28 U.S.C. § 1367, the Second Circuit has advised district courts that "'in the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988). This is the "usual case" envisioned in *Valencia*. All that remains in this case are claims that involve complex issues of state law.  Therefore, in the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Mr. Graham's claims for violations of the Connecticut's Fair Employment Practices Act, breach of contract, and defamation.

V.

In sum, the Court GRANTS IN PART Defendants' Motion for Summary Judgment [doc. # 37]. The Court directs the Clerk to: (1) enter judgment for Defendant and against Plaintiff on Count Two of the Complaint, which alleges an ADA violation; and (2) dismiss for lack of jurisdiction Counts One, Three and Four of the Complaint, which allege a violation of Connecticut's Fair Employment Practices Act, breach of contract, and defamation, respectively.  Plaintiff will be free to re-file his state law claims in state court. Each side shall bear its own costs and attorneys' fees. **The Clerk is directed to close this file.**

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>September 6, 2006</u>**.

22